# Exhibit A

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

File No. 1118-504

------------------------------------------------------------x

STERLING NATIONAL BANK

CIVIL ACTION
Case No.:

Plaintiff,

**COMPLAINT**

v.

COMPUTER SOLVERS INC., JEROME N.
GREENBERG and TERRI G. NOEL a/k/a TERRI
LYNN GREENBERG a/k/a TERRI NOEL a/k/a
TERRI L. GREENBERG, Individually,

Defendants.

------------------------------------------------------------x

Sterling National Bank ("SNB") or "Plaintiff"), by its attorneys, Platzer, Swergold,

Karlin, Levine, Goldberg & Jaslow, LLP as and for its complaint herein against the defendants

alleges as follows:

### THE PARTIES

1.      SNB is a national banking association organized under and pursuant to the laws of

the United States of America, with its principal place of business in the State of New York, and

doing business at 500 Seventh Avenue, New York, New York 10018.

2.      Defendant, Computer Solvers Inc., ( "Corporate Defendant" or "Borrower") is,

upon information and belief, a corporation duly organized under and pursuant to the laws of the

State of Virginia with its principal place of business located at 5269 Greenwich Rd., Suite 101,

Virginia Beach, Virginia 23462.

3.      Upon information and belief, Jerome N. Greenberg ("Greenberg"), is and, at all

times hereinafter mentioned, was an individual residing and domiciled at 549 Windgate Road,

DeRidder, Louisiana 70634.

4.    Upon information and belief, Terri G. Noel a/k/a Terri Lynn Greenberg a/k/a Terri

Noel a/k/a Terri L. Greenberg ("Noel"), is and, at all times hereinafter mentioned, was an

individual residing and domiciled at 433 Caren Drive, Virginia Beach, VA 23452-3511 and 4614

Guam Street, Virginia Beach, VA 23455 (Greenberg together with Noel referred to herein as the

"Guarantors").

## JURISDICTION AND VENUE

5.    This court has jurisdiction over the subject matter of this action under 28 U.S.C.

Section 1332(a), by virtue of the diversity of citizenship between Plaintiff and Defendants.

Further, the matter in controversy exceeds the sum of $75,000, exclusive of interests and costs.

6.    The venue of this action is properly brought in this District pursuant to 28 U.S.C.

Section 1391(a), because the Plaintiff conducts business and/or resides in this District, and a

substantial part of the events giving rise to the claims herein occurred in this District.

## FACTUAL BACKGROUND COMMON TO ALL CLAIMS

7.    On or about October 8, 1999, the Corporate Defendant entered into a Loan,

Security and Service Agreement ("LSSA") with the Plaintiff whereby the Corporate Defendant

was granted a revolving line of credit by the Plaintiff.

8.    A copy of the LSSA is annexed hereto and made a part hereof as Exhibit "A".

9.    Paragraph numbered "1.1(b)(I)"of the LSSA provided, *inter alia,* that Corporate

Defendant could borrow from Plaintiff up to the Advance Limit defined therein in the aggregate

amount of $500,000.00 or 75% of the amount of the Corporate Defendant's Eligible Receivables

as defined in the LSSA.

10.     Paragraph numbered "1.1(b)(ii)" of the LSSA provided, *inter alia*, that Plaintiff could, in its discretion, increase the amount of the Advance Limit.

11.     The LSSA provides for interest to be paid upon the outstanding balance in the amount of the greater of 18.5% or 10% above the Base Rate, as defined therein.

12.     The LSSA also provided, *inter alia*, that the Corporate Defendant granted Plaintiff a first priority continuing security interest in certain Collateral, as defined in Article numbered "2" of the LSSA, including but not limited to, such Corporate Defendant's inventory and account receivables.

13.     The LSSA also provides, *inter alia*, that:

> 7.     DEFAULT
> The occurrence of any of the following shall constitute an event of default ("Event of Default"):
> 7.1     Failure to Pay.  Failure to pay an Obligation or part thereof, including any installment of principal or interest or other charges due and owing to Lender ...when due;
> 7.2     Failure to Perform.  Failure to perform or abide by any covenant contained in this Agreement or the Relevant Documents;
> 7.3     Cross Default; Default on Other Debt.  The occurrence of any default on any obligation or indebtedness of ... any guarantor of Borrower ...
> 7.4     False Representation or Warranty.  The Borrower shall have made any representation or warranty in this Agreement ...which is at any time found to have been false in any material respect at the time such representations or warranty was made or thereafter.
>
>
>
> 7.8     Change in Condition.  There occurs any change in the condition or affairs, financial or otherwise, of Borrower or of any endorser, guarantor of Borrower or surety for the liability of Borrower to Lender which in the opinion of Lender impairs Lender's security or increases its risk;

7.10    *Insecurity*. At any time the Lender deems itself insecure.

14.     Events of Default have occurred with respect to the LSSA by virtue of, *inter alia*, the following, which defaults have occurred independently and cumulatively with respect to the Corporate Defendant and Guarantors:

(a)     Corporate Defendant's failure to pay all amounts due pursuant to the LSSA including but not limited to, repayment of Advances (as defined in the LSSA) and interest, following demand therefore and/or subsequent to the occurrence of other events requiring the payment in full of all sums outstanding under the LSSA;

(b)     Cessation of business operations of the Corporate Defendant, in violation of, inter alia, Sections 3.6 and 5.2;

(c)     Guarantor Greenberg's default of other obligations which have been declared in default and due prior to its date of maturity.

15.     Accordingly, all sums currently outstanding pursuant to the LSSA are now due and owing in full, no part of which have been paid, despite demand therefore.

## FIRST COUNT
### (BREACH OF CONTRACT)

16.     Plaintiff repeats, reiterates and realleges the allegations set forth in paragraphs "1" through "15" of this Complaint as more fully set forth at length herein.

17.     By letter dated April 23, 2007, demand was made upon the Corporate Defendant for payment of Corporate Defendant's debt to the Plaintiff . A copy of the demand letter is

annexed hereto and made a part hereof as Exhibit "B".

18.    As of this date, no part of the amount due and owing to the Plaintiff has been paid by the Corporate Defendant.

19.    By the reason of the foregoing the Corporate Defendant is in breach for failure to pay the amounts outstanding pursuant to the LSSA, although duly demanded. As a result of said breach, there is now due and owing, pursuant to the terms of the LSSA, the amount of $456,249.01, with interest continuing to accrue thereon from April 18, 2007.

20.    Pursuant to section "8.5" of the LSSA, the Corporate Defendant agreed to pay attorneys' fees in the amount of 15% of the Obligations, as defined, plus disbursements in the event of a default.

21.    As a result of the foregoing, the Corporate Defendant is indebted to the Plaintiff in the total amount of $456,249.01, with interest continuing to accrue thereon from April 18, 2007 to the date of entry of judgment herein, plus attorneys' fees and expenses pursuant to the terms of the LSSA, plus the costs and disbursements of this action.

## SECOND COUNT
### (UNJUST ENRICHMENT)

22.    Plaintiff repeats, reiterates and realleges the allegations set forth in paragraphs "1" through "21" of this Complaint as if more fully set forth at length herein.

23.    The Corporate Defendant has failed to account for, pay over and deliver the Advances, as defined in the LSSA, and has retained same for its own use and benefit.

24.    Such conduct by the Corporate Defendant has caused it to be unjustly enriched to the detriment of the Plaintiff.

25.   As a direct and approximate result of the Corporate Defendant's conduct, Plaintiff has been and will continue to be damaged in the amount of $456,249.01, with interest continuing to accrue thereon from April 18, 2007 to the date of entry of judgment herein, plus attorneys' fees and expenses pursuant to the terms of the LSSA, and the costs and disbursements of this action.

### THIRD COUNT
### (ACCOUNT STATED)

26.   Plaintiff repeats, reiterates and realleges the allegations set forth in paragraphs "1" through "26" of this Complaint as if more fully set forth at length herein.

27.   That on a regular basis Plaintiff rendered statements of account to the Corporate Defendant .

28.   The Corporate Defendant accepted and retained said statements of account without dispute.

29.   As a result of the foregoing, Plaintiff has stated an account with the Corporate Defendant in the amount of $456,249.01, plus interest continuing to accrue thereon from April 18, 2007.

30.   As a result of the foregoing, the Corporate Defendant is indebted to the Plaintiff in the total amount of $456,249.01, with interest continuing to accrue thereon from April 18, 2007 to the date of entry of judgment, plus attorneys' fees and expenses pursuant to the terms of the LSSA, and the costs and disbursements of this action.

### FOURTH COUNT
### (BREACH OF CONTRACT- THE GUARANTEES)

31.   Plaintiff repeats, reiterates and realleges the allegations set forth in paragraphs "1" through "30" of this Complaint as if more fully set forth at length herein.

G:\wpdocs\working\COMMERCI\Sterling Bank\Computer Solvers, Inc\s&c v2.10-1-07.wpd

32.    In connection with the LSSA and in consideration of financial accommodations given or to be given or continued to be given by Plaintiff to the Corporate Defendant and to induce the Plaintiff to extend or continue credit to the Corporate Defendant, on or about October 8, 1999, each of the Guarantors executed his/her guaranty (the "Guarantees"), copies of which are annexed hereto and made a part hereof as Exhibits "C" and "D", respectively.

33.    Each of the Guarantees provide, in pertinent part, that:

> [T]he undersigned [Guarantor] ... absolutely and unconditionally guarantee the full and prompt payment when due, by acceleration or otherwise, and at all times thereafter, to Bank, its successors, transferees, and assigns, of any and every liability or liabilities in any amount, of any nature and in any form, now existing or hereafter arising, of or from ... Obligor to Bank...whether absolute or contingent, direct or indirect, secured or unsecured...and any and all expenses including attorneys' fees... (Liabilities).

34.    The Guarantors each agreed that they would be jointly and severally liable to the Plaintiff for the Corporate Defendant's Liabilities, as defined in the Guarantees, to the Plaintiff.

35.    Demand letters were sent to the Guarantors on September 19,. 2006, February 5, 2007 and April 23, 2007.  Copies of the demand letters are annexed hereto collectively, as Exhibit "E" and made a part hereof.

36.    By virtue of the Corporate Defendant's default, the Guarantors are each liable to the Plaintiff in an amount of $456, 249.01, with interest continuing to accrue thereon from April 18, 2007 to the date of entry of judgment, plus attorneys' fees and expenses pursuant to the terms of the Guarantees, and the costs and disbursements of this action.

**WHEREFORE,** Plaintiff respectfully demands judgment as against the Defendants as follows:

(1)    on the First Count: the Plaintiff demands judgment against the Corporate Defendant in the sum of $456,249.01, with interest continuing to accrue thereon from April 18, 2007 to the date of entry of judgment, plus attorney's fees and expenses pursuant to the terms of the LSSA, and the costs and disbursements of this action; and

(2)    on the Second Count : the Plaintiff demands judgment against the Corporate Defendant in the sum of $456,249.01, with interest continuing to accrue thereon from April 18, 2007 to the date of entry of judgment, plus attorney's fees and expenses pursuant to the terms of the LSSA, and the costs and disbursements of this action;

(3)    on the Third Count: the Plaintiff demands judgement against the Corporate Defendant in the sum of $456,249.01, with interest continuing to accrue thereon from April 18, 2007 to the date of entry of judgment, plus attorney's fees and expenses pursuant to the terms of the LSSA, and the costs and disbursements of this action;

(4)    on the Third Count : the Plaintiff demands judgment against the Guarantors, jointly and severally, in the of $456,249.01, with interest continuing to accrue thereon from April 18, 2007 to the date of entry of judgment, plus attorney's fees and expenses pursuant to the terms of the Guarantees, and the costs and disbursements of this action;

(5)     and such other and further relief as the Court may deem just and proper.


Dated: New York, New York
      October 2, 2007

                                  **PLATZER, SWERGOLD, KARLIN,**
                                  **LEVINE, GOLDBERG & JASLOW, LLP**
                                  *Attorneys for the Plaintiff*

                                  By:_____
                                      **LINDA MANDEL GATES (LMG/4953)**
                                      1065 Avenue of the Americas, 18th Floor
                                      New York, New York 10018
                                      212-593-3000 Tel.
                                      212-593-0353 Fax

PLATZER, SWERGOLD, KARLIN,
LEVINE, GOLDBERG & JASLOW, LLP
*COUNSELORS AT LAW*

# EXHIBIT A

## LOAN, SECURITY AND SERVICE AGREEMENT

Loan, Security and Service Agreement ("Agreement") made this 8th day of October, 1999 between STERLING NATIONAL BANK ("Lender"), having an address at 500 Seventh Avenue, New York, NY 10018 and COMPUTER SOLVERS, INC. ("Borrower"), a Virginia corporation having its principal place of business at 5269 Greenwich Road, Suite 101, Virginia Beach, VA 23465.

### RECITAL

Borrower desires to obtain loans from Lender from time to time on a secured basis, and Lender has agreed to do so, subject to and upon the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the Recital and the mutual covenants herein contained, Lender and Borrower agree as follows:

1.    REVOLVING LOAN

1.1    Amount of Revolving Loan.

(a)    During the term of this Agreement, provided there has not occurred an Event of Default hereunder (as hereinafter defined) or an event which, with the giving of notice or the lapse of time, or both, would become an Event of Default hereunder, Lender will provide in its sole and absolute discretion, at one time or from time to time, at the request of Borrower, loans to Borrower on a revolving basis (the "Revolving Loan") in an aggregate amount up to Borrower's Advance Limit (as hereinafter defined) from time to time in effect, which Revolving Loan shall be payable at the earlier of (i) fifteen (15) calendar days from demand by Lender or (ii) such other time as provided in this Agreement.  If the outstanding amount of the Revolving Loan shall exceed the Advance Limit at any time, such excess shall be deemed secured by the "Collateral" (as hereinafter defined) and shall be subject to the terms of this Agreement.

(b)(i)    Definition of Advance Limit.  The term "Advance Limit" shall mean the amount of the Revolving Loan which the Lender may, in its sole and absolute discretion, from time to time make to Borrower, up to the lesser of Five Hundred Thousand Dollars ($500,000.00) or 75% of the amount of the Borrower's "Eligible Receivables" (as hereinafter defined).

(ii)  Lender shall have the right, from time to time, in its sole and absolute discretion, to increase or decrease the amount of the Advance Limit; and the Revolving Loan advanced on the basis thereof shall nevertheless be secured by the Collateral and subject to the terms of this Agreement.

(iii)     If at any time the Obligations (as hereinafter defined) exceed the dollar amount specified in section 1.1(b)(i) above or if the ratio of Obligations to Eligible Receivables (as hereinafter defined) exceeds the percentage specified in section 1.1(b)(i) above, Borrower shall, upon notification of such fact by Lender, forthwith pay to Lender such amount as will reduce the Obligations to the foregoing dollar amount or percentage of Eligible Receivables.

(c)     Definitions of "Receivables", "Eligible Receivables", "Goods", "Military Allotment Accounts", "Account Debtor", and "Military Account Debtor".

(i)     The term "Receivables" shall mean all accounts, accounts receivable, contract rights, chattel paper, and general intangibles as defined in the Uniform Commercial Code of New York or of such other state the law of which may be applicable, and, in addition, any and all obligations of any kind at any time due and/or owing to Borrower and all rights of Borrower to receive payment or any other consideration, including without limitation, consumer obligations, consumer installment contracts, revolving credit obligations and agreements, invoices, contract rights, choses-in-action, notes, drafts, acceptances, instruments, and all other debts, obligations and liabilities in whatever form owing to Borrower from any person, firm, governmental or taxing authority, corporation or any other entity, including intercompany accounts and notes receivable, all documents, contracts, invoices and instruments evidencing or constituting the same, all security therefor, and all Borrower's rights to goods, sold or unsold (whether delivered, undelivered, in transit, returned, rejected by, or repossessed from customers), which may be represented thereby, whether now existing or hereafter arising, together with all proceeds and products of any and all of the foregoing. Receivables shall include any of the foregoing now existing or hereafter created by Borrower or acquired by Borrower from others.

(ii)     The term "Eligible Receivables" shall mean the Receivables (a) as to which Borrower has furnished to Lender adequate information at such times and in such form as has been or, from time to time may be requested by Lender to permit Lender to accept the Receivable as an Eligible Receivable, and (b) which meet all of the following criteria on the origination date of the said Receivables and continuing thereafter until collected, and (c) which are in all other respects acceptable to Lender in its sole and unrestricted discretion:

(a)     Borrower is the sole owner of the Receivables, and has not sold, assigned, mortgaged or hypothecated, nor released from Lender's security interest, all or any portion thereof, nor are they subject to any claim, lien or security interest of any persons or entities, including without limitation the United States of America, any state, city, town, county, or other local governing unit, or any agencies, authorities, or instrumentalities thereof, except as disclosed on Schedule 5 annexed hereto and made part hereof;

2

(b)    The Receivables shall be valid and legally enforceable, owing to Borrower for the performance of services or the sale of goods arising in the ordinary course of business, whether by Borrower or by others, for which Borrower has delivered, or, at the time of origination of the said Receivables, if required by Lender, will deliver to Lender invoices, billings and shipping documents and other documents evidencing the obligation to pay the Receivables;

(c)    No financing statement covering any Receivables or the proceeds thereof is on file in any public office except in favor of Lender, and neither Borrower nor Lender has received any notice of any proposed acquisition of a Receivable or security interest therein, except as disclosed in Schedule 5 annexed hereto and made part hereof;

(d)    The Account Debtors (as hereinafter defined) obligated thereon shall remain less than two payments contractually delinquent in the case of account debtors whose only payment is their down payment, or less than three payments contractually delinquent in the case of account debtors who have commenced making their required monthly installment payments;

(e)    The Receivables are not subject to any offsets, credits, allowances, counterclaims or adjustments due the Account Debtor except usual and customary prompt payment discounts, nor has the Account Debtor returned the goods or indicated any dispute or complaint concerning the goods;

(f)    Borrower has not received any notice, nor has it any knowledge of any facts, which adversely affect the credit of the Account Debtor; and

(g)    Lender has not notified Borrower that either the Receivable or the Account Debtor is not an Eligible Receivable.

(h)    No petition under the Bankruptcy Act or any similar federal or state statute or a petition for receivership or assignment for the benefit of creditors has been filed by or against the Account Debtor or its property.

(iii)    The term "Goods" shall mean, in addition to the definition thereof contained in the Uniform Commercial Code of the State of New York, consumer goods, machinery and equipment, furniture, furnishings and fixtures, farm products and inventory (including without limitation, all goods intended for sale or lease, or to be furnished under contracts of service, work in process and raw materials, and all materials and supplies of every nature used or usable in connection with the packing, shipping, advertising, selling, leasing or furnishing of such goods), all substitutions, accretions, component parts, replacement parts, replacement thereof and additions thereto, as well as all accessories, motors, engines, auxiliary parts used

in connection with or attached thereto and any packing material in which such Goods may be contained, now owned or hereafter created or acquired and wherever located;

(iv)    The term "Military Allotment Account" shall mean the account of a Military Account Debtor (as hereinafter defined) for which a payroll allotment is initiated by the Military Account Debtor to provide for the payment of the Military Account Debtor's monthly obligation to Borrower.

(v)    The term "Account Debtor" shall mean a person (other than Borrower or a guarantor of the Obligations of Borrower) who is obligated on a Receivable.

(vi)    The term "Military Account Debtor" shall mean an Account Debtor who is a member of the United States Armed Forces.

1.2    Interest Rate. The Revolving Loan shall bear interest during each calendar month at a fluctuating interest rate per annum equal at all times to the greater of eighteen and one-half percent (18.5%) or ten percentage points (10%) above the Base Rate (as hereinafter defined) of interest in effect from time to time, each change in such fluctuating rate to take effect simultaneously with the corresponding change in such Base Rate, without notice to Borrower. In no event shall the interest be higher than the maximum lawful rate. Interest shall be calculated on a daily basis upon the unpaid balance with each day representing 1/360th of a year.

1.3    Base Rate. The "Base Rate" is the interest rate announced by Lender from time to time as a guide for determining interest and is not necessarily the rate charged to Lender's most creditworthy customers. The Base Rate in effect as of the date of this Agreement is 8.5%.

1.4    Payment of Interest. Lender shall send Borrower an invoice for interest on the Revolving Loan at the end of each calendar month. Interest shall be due and payable upon Borrower's receipt of said invoice. Any failure or delay by Lender in presenting invoices for interest payments shall not discharge or relieve Borrower of the obligation to make such interest payments. Lender may, at its option compute the interest due from Borrower and (a) debit Borrower's account with Lender for the amount of interest due, or (b) add the amount of interest due to the Revolving Loan balance as of the last day of the preceding month, or at any time thereafter, and said interest shall become part of the principal balance owing.

1.5    Services of Lender and Service Charges.

(a)    Lender shall provide installment payment books or periodic statements to Account Debtors and shall post all payments received from Account

Debtors to Borrower's account. Lender shall provide Borrower with periodic reports regarding assigned Collateral and the aging thereof, Account Debtor delinquencies, advances made to Borrower and interest thereon, and the application of collections of Receivables.

(b)  Borrower shall pay to Lender a one-time $5.00 set up fee for each Receivable and shall thereafter pay a monthly service charge to Lender of seventy-five cents ($.75) for each Receivable. Any Receivable which has a balance which is not equal to zero shall be considered an active account for the purpose of computing the service charge. In addition, there shall be a one-time fee of $10 for each Account Debtor whose account is paid through an automated clearing house system.

## 2.    SECURITY INTEREST

### 2.1    Security Interest.

(a)    As collateral security for (i) the due and punctual payment of the Revolving Loan, all interest thereon, and any and all extensions, renewals, substitutions and changes in form thereof; (ii) all Obligations (as hereinafter defined); and (iii) all costs and expenses incurred or paid by Lender to enforce its rights pursuant to this Agreement, the Relevant Documents (as hereinafter defined) or otherwise (including without limitation outside or in-house attorneys' fees), Borrower hereby pledges, transfers, assigns, sets over and grants to Lender a first priority and continuing security interest in the Collateral (as hereinafter defined) wherever located and whether now existing or hereafter created or acquired by Borrower, except as may be set forth on Schedule 5 annexed hereto and made part hereof.

(b)    Lender shall be under no obligation to proceed against any or all of the Collateral before proceeding to collect the Revolving Loan and Obligations directly from Borrower or any guarantor of Borrower.

2.2    Continuation of Security Interest. The security interest granted in this Agreement shall continue in full force and effect until the Borrower has fully paid and discharged all of the sums referred to in Subsection 2.1(a) hereof and until this Agreement is terminated.

2.3    Definitions  of  "Obligations",  "Relevant  Documents"  and "Collateral".

(a)    The term "Obligations" shall mean all indebtedness, obligations, liabilities, and agreements of every kind and nature of Borrower to or with Lender (including but not limited to the Revolving Loan) and to or with any affiliate of

5

Lender, or of any guarantor of Borrower's indebtedness, obligations, liabilities and agreements to or with Lender, or to, or with any affiliate of Lender, now existing or hereafter arising or acquired, and now or hereafter contemplated, pursuant to this Agreement, the Relevant Documents (as hereinafter defined) or otherwise, whether in the form of financing, letters of credit, bankers acceptances, guarantees, loans, interest, charges, overdrafts, expenses or otherwise, direct or indirect including without limitation any participation or interest of Lender or of an affiliate of Lender in any obligations of Borrower to others, acquired outright, conditionally or as collateral security from another, absolute or contingent, joint or several, matured or unmatured, primary or secondary, due or to become due, liquidated or unliquidated, secured or unsecured, arising by operation of law or otherwise, including without limitation any future advances, renewals, extensions or changes in form of, or substitutions for, any of said indebtedness, obligations or liabilities, the other sums and charges to be paid to Lender pursuant to any other sections of this Agreement, and all interest and late charges on any of the foregoing. "Obligations" shall further include all charges and fees that Lender may have incurred in filing public notices and any local taxes relating thereto, all costs and expenses (including outside or in-house attorneys fees) incurred by Lender in efforts made to enforce payment or to otherwise effect collection of any Collateral, in protecting, maintaining, preserving, enforcing or foreclosing the pledge, lien and security interest in Collateral of Lender hereunder, and in defending or prosecuting any actions or proceedings arising out of or relating to Lender's transactions with Borrower, through judicial proceedings or otherwise, all of which Borrower agrees to pay as provided herein. If the Lender shall become liable to the United States of America in relation to wages of employees of Borrower by virtue of Section 3505 of the Internal Revenue Code of 1954 (as added by Section 105 of the Federal Tax Lien Act of 1966), whether or not such amount has been paid by Lender, such amount shall be an Obligation by Borrower to Lender hereunder. Borrower authorizes Lender to pay any such amount to the United States of America on behalf of Borrower, but Lender shall not be obligated to do so or continue to do so. Borrower authorizes Lender to pay to any landlord on behalf of Borrower the amount of any statutory landlord's lien on premises on which or in the contents of which Lender has an interest.

       (b)     The term "Relevant Documents" shall mean any and all documents and instruments now or hereafter executed or delivered by Borrower or any guarantor of Borrower to Lender pursuant or incident to this Agreement or otherwise.

       (c)     The term "Collateral" shall mean the following, whether now or hereafter existing or created or now or hereafter acquired by Borrower:

          (i)     The Borrower's Receivables, as defined herein;

          (ii)     The Borrower's Goods, as defined herein;

6

(iii)    Any claims of Borrower against third parties for payment of any Receivable or for loss or damage thereto, or destruction thereof, and all documents of title, insurance policies, certificates of insurance, insurance proceeds, securities, chattel paper, and other documents and instruments evidencing or pertaining to any of the foregoing; and all files, correspondence, computer programs, tapes, discs and related data processing software owned by Borrower, or in which Borrower has an interest, which contain information identifying, referring to or relating to any one or more of the items referred to in in this Section 2.3(c), or to any Account Debtor, which information shows the amounts owed by each, payments made thereon, or otherwise is necessary or helpful in the realization thereon or the collection thereof;

(iv)    Any and all moneys, securities, drafts, notes, items, contract rights, leases, personal property and general intangibles (including, without limitation, all customer lists, credit files, supplier lists, catalogs, formulations, manufacturing procedures, quality control procedures, product specifications, sales materials, records and service marks, brand names, patents, patent rights, patent applications, corporate names, franchises, copyrights, licenses, permits, processes, trademarks, trademark rights, trade names, trade name rights, trade styles, and trade secrets, together with the goodwill of Borrower thereby represented);

(v)    All other property of Borrower, now or hereafter held or received by or in transit to Lender from or for Borrower, or which may now or hereafter be in the possession of Lender, or as to which Lender may now or hereafter control possession, by documents of title or otherwise, whether for safekeeping, custody, pledge, transmission, collection or otherwise, and any and all deposits, general or special, balances, sums, proceeds and credits of Borrower, on the books of Lender or on the books of any affiliate of Lender, and all rights and remedies which the Borrower might exercise with respect to any of the foregoing but for the execution of this Agreement;

(vi)    All renewals, substitutions, profits, accessions, accessories, replacements, additions, proceeds and products of, to or for the Collateral, including without limitation, the proceeds of any Receivable, without regard to whether it is an Eligible Receivable; and

(vii)    All property securing the obligations of any guarantor of the Borrower.

2.4    <u>Further Assurances.</u>  Borrower shall take such steps and execute and deliver such financing statements and other documents all in form and substance satisfactory to Lender relating to the creation, validity, assignment or perfection of the security interests provided for herein, under the Uniform Commercial Code or other laws of the State of New York or of another state or states as Lender may from time

7

to time request. Borrower hereby constitutes Lender and each of its officers, agents or designees as Borrower's Attorney in Fact, with power to execute in Borrower's name as well as in Lender's name and to file such financing statements and other documents. This power, being coupled with an interest, is irrevocable while any Obligations shall remain unpaid. Borrower authorizes Lender to file in its own name as secured party any financing statement under the Uniform Commercial Code which Lender deems necessary or advisable to perfect the security interest which it is intended that Lender have under this Agreement.

2.5    Delivery of Collateral.    Upon written notice to Borrower, Borrower shall, at its expense promptly deliver any or all Collateral not otherwise in the possession or control of Lender to such place as Lender may designate.

## 3.    REPRESENTATIONS AND WARRANTIES

Borrower, knowing and intending that Lender shall rely thereon in making the loans contemplated by this Agreement, hereby represents, covenants and warrants to Lender (which representations, covenants and warranties shall be deemed to be incorporated by reference in each confirmatory assignment submitted by Borrower to Lender and shall in any event be deemed to be repeated and confirmed with respect to each Receivable as it is created or otherwise acquired by Borrower) that:

### 3.1    Organization and Qualification.

(a)    Borrower is and will continue to be duly organized and validly existing and in good standing under the laws of the State in which Borrower is organized, and is and will continue to be qualified and in good standing in all jurisdictions wherein the character of the property owned or the nature of the business transacted by Borrower makes licensing or qualification as a foreign entity necessary.

(b)    A true, accurate and complete copy of Borrower's valid resolution authorizing the transactions contemplated herein, and Borrower's certificate of incorporation and by-laws all as in effect on the date hereof and certified by the Secretary of the Borrower, has been delivered to Lender.

### 3.2    Due Authorization; No Default; Compliance with Law.

(a)    The execution, delivery and performance by Borrower of this Agreement and the Relevant Documents have been duly authorized by all necessary action on the part of Borrower; are not inconsistent with its certificate of incorporation, by-laws and other governing documents; do not contravene any law, governmental rule, regulation or order applicable to Borrower; and do not and will not

8

contravene any provision of, or constitute a default under, any indenture, mortgage, contract or other instrument or any order, writ, injunction or decree to which Borrower is a party or by which it or its properties or assets are bound.

(b)    This Agreement and the Relevant Documents, upon their execution and delivery will constitute the legal, valid and binding agreements of Borrower, enforceable in accordance with their terms.

(c)    Borrower's conduct of its business, and all documents and procedures used by Borrower in the conduct of its business, comply in all respects with any and all federal, state or local laws and regulations applicable thereto. At Lender's request, Borrower shall provide to Lender an opinion letter from counsel in each jurisdiction where Borrower enters into or acquires retail installment contracts, consumer obligations, revolving credit obligations and agreements, leases, or other loan, credit or financing agreements, that such contracts or agreements are valid and enforceable, and do not violate any federal, state or local laws or regulations. The substance of each opinion letter shall be satisfactory to Lender's counsel in its sole discretion.

3.3    No Governmental Consent Necessary.    No consent or approval of, giving of notice to, registration with or taking of any other action in respect of, any governmental authority or agency is required with respect to the execution, delivery and performance by Borrower of this Agreement and the Relevant Documents.

3.4    No Proceedings.    There are no actions, suits, or proceedings pending or threatened against or affecting Borrower in any court or before any governmental commission, board or authority.

3.5    Financial Statements.

(a)    Subject to any limitation stated therein, all balance sheets, income statements and other financial data which have been or shall hereafter be furnished to Lender to induce it to enter into this Agreement, and to continue to provide financing under this Agreement or otherwise in connection herewith, now do and hereafter will truly and accurately represent the financial condition of Borrower as at the respective dates thereof and the results of its operations for the periods for which the same are furnished to Lender. All other information, reports and other papers and data furnished to Lender are, or will be at the time the same are so furnished, true, accurate and complete in all material respects. All such financial statements and other information have been prepared, or will have been prepared at the time of issuance, in accordance with generally accepted accounting principles consistently applied during all periods by certified public accountants acceptable to Lender.

(b)    Except as shown on the most recent financial statements which have been delivered to Lender and as set forth on Schedule 1 attached hereto and made part hereof, Borrower and any guarantors of Borrower have no other liabilities as of the date hereof.

3.6    Borrower's Solvency; Changes in Financial Condition.    Borrower and all guarantors of Borrower's Obligations are solvent and will remain so and have induced Lender to make advances hereunder upon the written representations of Borrower and the guarantors of Borrowers concerning their financial responsibility, which they agree to renew in writing to Lender upon request from time to time, but in any event not less than once each year. No federal tax lien has been assessed against Borrower or a guarantor of Borrower which remains unpaid and undischarged. Borrower is not and will not be during the term of this Agreement in default to the United States of America or to any state in payment or deposit of any withholding taxes or F.I.C.A. taxes, and will furnish proof in respect thereto on request. There has been no material change in the financial condition of Borrower or of any guarantors of Borrower since the date of their last financial statements which have been delivered to Lender and are listed on Schedule 1 attached hereto and made part hereof.

3.7    Receivables.

(a)    Any list or schedule of Receivables delivered by Borrower to Lender at any time shall be complete and shall contain an accurate aging of the Receivables listed.

(b)    At the time any Receivable becomes subject to a security interest in favor of Lender, said Receivable shall be a good and valid account representing an undisputed, unconditional bona fide indebtedness incurred by the Account Debtor named therein for merchandise sold and delivered, or if so indicated in the papers delivered to Lender, sold and shipped, or sold and held subject to delivery instructions, or for services theretofore fully performed by the Borrower for said Account Debtor, or for money loaned by Borrower to said Account Debtor. There are and shall be no set-offs or counterclaims or rights of recoupment against any such Receivable; no agreement under which any deduction or discount may be claimed shall have been made with Borrower on any such Receivable except as indicated in a written list, statement, or invoice furnished to Lender; and Borrower shall be the lawful owner of each such Receivable and shall have the right to subject the same to a first and prior security interest in favor of Lender, without limitation by any agreement or document to which Borrower is a party or by which it is bound. No such Receivable shall have been or shall thereafter be sold, assigned or transferred to any person other than Lender or in any way encumbered except to Lender and no other person shall have proceeds claims thereto, and the Borrower shall defend the same against the claims and demands of all persons.

10

(c)     All statements made and all unpaid balances appearing in the invoices, documents and instruments representing or constituting any Receivable or in the title retention or security agreement accompanying such Receivable, and the nature of the transaction as indicated, are true and correct and are in all respects what they purport to be. All signatures and endorsements appearing thereon are genuine and all signatories and endorsers have full capacity to contract.

3.8     Value of Goods. Borrower's Goods now are and shall continue to be usable or saleable in the ordinary course of its business. Obsolete Goods, Goods below standard quality and Goods in the process of repair have been written down to realizable market value on Borrower's balance sheet, or adequate reserves have been provided therefor, and the values carried on the balance sheet are set at the lower of cost or market, in accordance with generally accepted accounting principles consistently applied.

3.9     Taxes and Assessments. Borrower has paid and discharged when due, and shall continue to pay and discharge when due, all taxes, assessments and other governmental charges which may lawfully be levied or assessed upon its income and profits, or upon all or any portion of any property belonging to it, whether real, personal or mixed, to the extent that such taxes, assessments and other charges have become due. Borrower has filed all tax returns, federal, state, and local, and all related information, required to be filed by it.

3.10    Location of Collateral. Schedule 2 to this Agreement accurately lists (a) all lessors of property leased by Borrower; (b) all mortgagees of property owned by Borrower; and (c) all premises where Collateral is or will be located. Borrower will not remove any Collateral, or cause or suffer any Collateral to be removed, from the premises listed on Schedule 2 except in the ordinary course of Borrower's business or with Lender's prior written consent.

3.11    Other Liens. Borrower has good and marketable title to and owns all of the Collateral free and clear of any and all liens, encumbrances or security interests whatsoever, except (i) those encumbrances created pursuant to this Agreement; and (ii) those encumbrances set forth on Schedule 5 annexed hereto and made part hereof. None of the Collateral is subject to any prohibition against encumbering, pledging, hypothecating or assigning the same or requires notice or consent pursuant to Borrower's doing of the same to Lender.

3.12    Books and Records. Borrower maintains its books and records at the address set forth in Schedule 4 annexed hereto and made part hereof.

3.13    Representations, Covenants, Warranties, and Statements True, Accurate and Complete.

11

(a)    None of the representations, covenants, warranties or statements made to Lender in, or in connection with, this Agreement or the transactions contemplated thereby, contains or will contain any untrue statement of a material fact, or omits or will omit to state a material fact necessary in order to make such statements true and correct in light of the circumstances in which they are or will be made.

(b)    All representations, covenants, warranties, representations, and statements made herein or in the Relevant Documents by Borrower are, and will be true, and accurate at all times.

3.14  <u>Names; Locations of Offices.</u> Schedule 4 annexed hereto and made part hereof sets forth a complete and accurate list of:

(a)    All names by which Borrower now is known or under which Borrower now is conducting business, including without limitation, all trade names, and all names by which Borrower has been known or under which Borrower has conducted business during the past ten years, including without limitation, all trade names; and

(b)    All offices and locations from which Borrower conducts any of its business or operations and its chief executive office if it has more than one place of business.

4.    <u>AFFIRMATIVE COVENANTS</u>

Borrower covenants and agrees that it will pay all Obligations when due. Until payment in full of all Obligations and the termination of this Agreement, Borrower covenants and agrees that it will:

4.1    <u>Notify Lender.</u> Promptly notify Lender if any one or more of the representations and warranties made by Borrower in this Agreement or in any Relevant Documents shall no longer be entirely true, accurate and complete, or upon the occurrence of an Event of Default (as hereinafter defined).

4.2    <u>Pay Taxes and Liabilities.</u> Promptly pay when due all indebtedness, sums and liabilities of any kind now or hereafter owing by Borrower to any party however created, incurred, evidenced, acquired, arising or payable, including income, sales and excise taxes with respect to Borrower's income, or to any of the Collateral, or to any wages or salaries paid or payable by Borrower or otherwise.

4.3    Observe Covenants etc. Observe, perform and comply with the covenants, terms and conditions of this Agreement, the Relevant Documents and any other agreement or document entered into between Borrower and Lender or any affiliate of Lender.

4.4    Maintain Legal Existence and Qualifications. Maintain and preserve, in full force and effect, its existence and rights, franchises, licenses and qualifications necessary to continue its business, and comply with all applicable statutes, rules and regulations pertaining to the operation, conduct and maintenance of its existence and business.

4.5    Information and Documents to be Furnished to Lender.

(a)    Borrower shall notify Lender if any Receivable includes any tax due to any governmental taxing authority. If a Receivable includes a charge for any tax payable to any governmental taxing authority, Lender is authorized, in its discretion, to pay the amount thereof for the account of Borrower and to charge the amount of such payment to the Revolving Loan.

(b)    Lender shall have the right at any time and from time to time to request from obligors indebted on Receivables, in the name of Borrower or in the name of Lender's or Borrower's accountants, information concerning any Receivable and the amounts owing thereon. Borrower agrees to maintain books and records pertaining to Collateral in such detail, form, and scope as Lender shall require and to promptly notify Lender of any change of name or address of Borrower or of the legal form of entity of Borrower, or of the location of Collateral. Borrower shall mark Borrower's ledger cards, books of account and other records relating to Collateral with appropriate notations satisfactory to Lender disclosing that they are subject to Lender's security interest. All records, ledger sheets, correspondence, invoices, delivery receipts, documents and instruments relating to Collateral shall be delivered to Lender, and until delivered to Lender, be kept by Borrower, without cost to Lender, in appropriate containers and in safe places at the same locations as they were located at the time this Agreement is entered into and shall bear suitable legends identifying them as being under Lender's dominion and control. Lender shall at all reasonable times have full access to and the right to audit any and all of Borrower's books and records, including but not limited to books and records pertaining to Collateral and including all files and correspondence with creditors and customers and to confirm and verify the amounts owing on Receivables and the value and collectibility of other Collateral and to do whatever else Lender reasonably may deem necessary to protect its interest.

(c)    Borrower hereby irrevocably authorizes and directs all accountants and auditors employed or engaged by Borrower at any time during the

13

term of this Agreement and all data processing centers or other persons holding materials herein mentioned relating to Borrower to exhibit to Lender and to deliver to it copies of any of Borrower's financial statements, trial balances or other accounting records of any sort in their possession, or data processing cards, disks, tapes, programs, tabulating runs, or similar material and to disclose to Lender any information they may have concerning Borrower's financial status and business operations, whether relating to Receivables or otherwise, and authorizes Lender to rely thereon. Borrower will at the request of Lender execute confirmatory letters of direction in accordance with this paragraph.

(d)    Borrower shall furnish confirmatory assignments and schedules of Collateral to Lender with each transmittal of Collateral at the time the initial Revolving Loan is made hereunder and from time to time thereafter, or as requested by Lender, in form and substance satisfactory to Lender, confirming Lender's continuing security interest in all present and future Collateral owned by Borrower, and together with each such confirmatory assignment and schedule to deliver to Lender the original consumer obligations, consumer contracts, revolving credit obligations, notes, chattel paper, evidences of indebtedness, leases, mortgages, certificates of title and such other instruments, contracts and documents evidencing, constituting or relating to Collateral or any security therefor as Lender may request, all of which shall bear or be accompanied by such endorsements, signatures, transfers or specific assignments as Lender shall require. Lender or any of Lender's agents or employees may, in the name and on behalf of Borrower execute any missing endorsements, signature, transfer or assignment or correct any defects therein, and Borrower hereby appoints Lender and any of agents or employees as attorneys-in-fact for Borrower to do any of the foregoing. To the extent such information is not otherwise known or available to Lender, Borrower agrees to furnish to Lender from time to time such reports in such detail and in such form as is satisfactory to Lender showing the amount of the outstanding Collateral, the amounts collected thereon, and such other information relating to Collateral as Lender may require. Borrower agrees to cause each of its present and future subsidiaries, if any, to execute such confirmatory assignments and schedules and to deliver such instruments and to furnish such reports relating to any and all Collateral in the same manner and with the same frequency as is required of Borrower under this Agreement.

(e)    Borrower agrees to furnish to Lender the following:

(i)    Annual Financial Statements. As soon as delivered to any other creditor or regulatory body, but in no event later than one hundred twenty (120) days after the end of each fiscal year, its balance sheet as at the end of such year, and its statement of income and retained earnings for such fiscal year, all in reasonable detail, all prepared in accordance with generally accepted accounting principles consistently applied, and all compiled by independent certified public

14

accountants whose opinion thereon shall be unqualified.    The certified public accountants shall be of recognized standing selected by Borrower and satisfactory to Lender.

                    (ii)    <u>Omitted.</u>

                    (iii)   <u>Omitted.</u>

                    (iv)   <u>Omitted.</u>

    4.6   <u>Collections.</u>

        (a)     Borrower will render such assistance to Lender in billing Account Debtors, as set forth in section 1.5(a) above, as Lender shall request.  Lender may send letters to Account Debtors who default on payments and shall forward any communications received from Account Debtors to Borrower, but, except as set forth in section 6.2 below, Borrower will at its own cost and expense adjust all claims and disputes with Account Debtors.

        (b)     All collections from Receivables shall be remitted directly to Lender.   Any remittance received by Borrower from Account Debtors shall be presumed to constitute collections on Receivables, shall be subject to the security interest granted to Lender hereunder, and shall be remitted by Borrower to Lender in the form received by Borrower. All amounts remitted on Receivables shall be credited to Borrower's current account with Lender.  No check, draft or other instrument received by Lender shall constitute payment to Lender unless and until such instrument has actually been collected and credited as collected to Lender's account. At Lender's option, up to three business days shall be allowed subsequent to receipt of remittance checks of Account Debtors or Borrower to permit bank clearance and collection of such checks before the amount thereof shall be deemed collected by Lender.  Lender shall have the right at all times to receive, receipt for, endorse, assign, deposit and deliver in Lender's name or in the name of Borrower any and all checks, notes, drafts and other instruments for the payment of money which may at any time be delivered to or otherwise received by Lender.  Borrower hereby authorizes Lender to affix, by facsimile signature or otherwise, the general or special endorsement of Borrower, in such manner as Lender shall deem advisable, to any such check, note, draft or other instrument in the event the same has been delivered to Lender without appropriate endorsement, and Lender and any bank in which Lender may deposit any such instrument is hereby authorized to consider such endorsement to be a sufficient, valid and effective endorsement by Borrower to the same extent as though it were manually executed by the duly authorized officer of Borrower, regardless of whom or under what circumstances or by what authority such facsimile signature or other endorsement is actually affixed, without duty of inquiry or responsibility as to such

matters, and Borrower and each guarantor of Borrower and endorser of the Obligations hereby waives demand, presentment, protest and notice of protest or dishonor and all other notices of every kind and nature with respect to any such instrument.

    4.7    Insurance Required.  Borrower shall:

    (a)    Cause one or more insurance policies to be maintained, in full force and effect on all Collateral given as collateral security for all Obligations, with responsible companies in such amounts, and against such risks as is usually carried by owners of similar businesses and properties in the same general areas in which Borrower operates (including but not limited to use and occupancy insurance, product liability insurance, Federal Flood Insurance (if available) and fidelity bonds), in any event not less in amount and type of coverage than it has in force on the date of execution of the Agreement. Said insurance policy or policies shall:

    (i)    Be in form and with insurers which are satisfactory to Lender;

    (ii)    Be for such risks and for such insured values as Lender may require in order to replace the property in the event of actual or constructive total loss;

    (iii)    Designate Lender as additional loss payee as its interests may from time to time appear;

    (iv)    Contain a "breach of warranty clause" whereby the insurer agrees that a breach of the insuring conditions or any negligence by Borrower or any other person shall not invalidate the insurance as to the Lender ;

    (v)    Provide that they may not be canceled or materially altered without thirty (30) days prior notice to the Lender; and

    (vi) Upon demand, be delivered to Lender.

    (b)    Notice of Loss.  In the event of loss or damage, forthwith notify Lender and file proofs of loss with the appropriate insurer. Borrower hereby authorizes Lender to endorse any checks or drafts constituting insurance proceeds.

    (c)    Proceeds.  Forthwith upon receipt of insurance proceeds, Borrower shall endorse and deliver the same to Lender.

    (d)    No Duty for Lender.  In no event shall Lender be required to (i) ascertain the existence of or examine any insurance policy or (ii) advise Borrower

16

in the event such insurance coverage shall not comply with the requirements of this Agreement.

4.8    Condition of Collateral; No Liens.    Borrower shall maintain all Collateral in good condition and repair at all times, preserve it against any loss, damage, or destruction of any nature whatsoever relating to said Collateral or its use, and keep said Collateral free and clear of any liens and encumbrances whatsoever, except those liens and encumbrances created pursuant hereto or disclosed herein.

4.9    Payment of Proceeds.    Borrower shall forthwith upon receipt of all proceeds of Collateral, pay such proceeds over to Lender, and such proceeds shall thereupon be credited to Borrower's current account with Lender.

4.10    Further Assurances.    Borrower shall at any time or from time to time upon request of Lender, execute and deliver such further documents and do such other acts and things as Lender may reasonably request in order to effectuate more fully the purposes of this Agreement, the Relevant Documents and any other instruments, documents and agreements which shall be executed simultaneously herewith, or which may hereafter be executed by Borrower with regard to the transactions contemplated hereby.

4.11    Pay Legal Fees and Expenses.    Borrower shall pay to Lender, upon demand, together with interest at the rate set forth in Section 1.2 hereof, from the date when incurred or advanced by Lender until repaid by Borrower all costs, expenses or other sums incurred or advanced by Lender (including legal fees and disbursements) to preserve, collect, protect its interest in or realize on the Collateral, and to enforce Lender's rights as against Borrower, any Account Debtor, or guarantor of Borrower, or in the prosecution or defense of any action or proceeding related to the subject matter of this Agreement or the Relevant Documents including without limitation legal fees, expenses and disbursements and those expenses referred to in Sections 6.5, 6.7 and 8.5 hereof. All such expenses, costs and other sums shall be deemed Obligations secured by the Collateral.

4.12    Records.    Borrower shall at all times keep accurate and complete records of the Collateral and the status of each Receivable.

4.13    Delivery of Documents.    If any proceeds of Receivables shall include or any Receivable shall be evidenced by notes, trade acceptances or instruments or documents, or if any Collateral is covered by documents of title or chattel paper, whether or not negotiable, Borrower shall immediately deliver them to Lender appropriately endorsed. Borrower waives protest regardless of the form of the endorsement. If Borrower fails to endorse any instrument or document, Lender is authorized to endorse the same on Borrowers behalf.

17

4.14  <u>United States Contract.</u>  If any Receivables arise out of contracts with the United States or any of its departments, agencies or instrumentalities, Borrower will notify Lender and execute any necessary instruments in order that all money due or to become due under such contract shall be assigned to Lender and proper notice of the assignment given under the Federal Assignment of Claims Act or other applicable law.

4.15  <u>Name Changes; Location Changes.</u>

(a)    Immediately notify Lender if Borrower is known by or conducting business under any names other than those set forth on Schedule 4 annexed hereto and made part hereof, and

(b)    Immediately notify Lender if Borrower is conducting any of its business or operations at or from offices or locations other than set forth on Schedule 4 annexed hereto and made part hereto, or if it changes the location of its chief executive office.

5.    <u>NEGATIVE COVENANTS</u>

Until the termination of this Agreement or payment in full of all Obligations, Borrower covenants and agrees that it will not:

5.1    <u>No Consolidation, Merger, Acquisition.</u> Consolidate with, merge with, be acquired by, or acquire the stock or assets of any person, firm, joint venture, partnership, corporation, or other entity, whether by merger, consolidation, purchase of stock or otherwise.

5.2    <u>Disposition of Assets or Collateral.</u> Sell, lease, transfer, convey or otherwise dispose of any or all of its assets or Collateral, other than the sale or lease of goods in the ordinary course of business.

5.3    <u>Other Liens.</u> Incur, create or permit to exist any mortgage, assignment, pledge, hypothecation, security interest, lien or other encumbrance on the Collateral or any of its assets, whether now owned or hereafter created or acquired, except (a) liens for taxes not delinquent; (b) those liens in favor of Lender created by this Agreement and Relevant Documents; and (c) those liens existing on the date hereof and as set forth on Schedule 5 annexed hereto and made part hereof.

5.4    <u>Other Liabilities.</u> Incur, create, assume or permit to exist any indebtedness or liability on account of borrowed money, the deferred purchase price of property, or leases except (a) Obligations to Lender; (b) indebtedness subordinated

18

to payment of the Obligations on terms approved by Lender in writing; or (c) those liabilities existing on the date hereof and appearing in financial statements of Borrower delivered to Lender.

    5.5    Loans.    Except as otherwise allowed herein Borrower shall not make loans to any person, firm or entity.

    5.6    Guaranties.    Assume, guarantee, endorse, contingently agree to purchase or otherwise become liable upon the obligation of any person, firm or entity except (a) by the endorsement of negotiable instruments for deposit or collection or similar transactions with Lender in the ordinary course of business; or (b) contingent obligations under letters of credit entered into in the ordinary course of business for the purchase of merchandise for resale by Borrower.

    5.7    Remove Collateral.    Except as otherwise provided in this Agreement, remove, or cause or permit to be removed, without Lender's prior written consent, any Collateral or assets of Borrower from those premises set forth on Schedule 2 annexed hereto and made part hereof except in the ordinary course of business.

    5.8    Transfers of Notes or Receivables.    Sell, assign, transfer, discount or otherwise dispose of any Receivable or any promissory note payable to it with or without recourse, except for collection with Lender in the ordinary course of business.

    5.9    Dividends and Distributions.    It will not purchase, redeem or otherwise acquire for value any shareholder or partnership interests of Borrower or return any capital to the shareholders or partners of Borrower and during the term of this Agreement, Borrower will not pay dividends to shareholders or make distributions of profits to partners of Borrower.

    5.10    Modification of Documents.    Change, alter or modify, or permit any change, alteration or modification of its certificate of incorporation, by-laws, partnership agreements or other governing documents without Lender's prior written consent.

    5.11    Change Business.    Change or alter the nature of its business.

    5.12    Settlements.    Compromise, settle or adjust any claims in a material amount relating to any of the Collateral, without the prior written consent of Lender.

    5.13    Change Location or Name.    Change the place where its books and records are maintained or change its name or transact business under any other name without the prior written consent of the Lender.

6.    MISCELLANEOUS RIGHTS AND DUTIES OF LENDER

6.1    Charges Against Credit Or Deposit Balances.    Lender, without demand and acting in its sole and absolute discretion, in each instance, may charge and withdraw from any credit or deposit balance which Borrower may then have with Lender or with any affiliate of Lender, any amount which shall become due from Borrower to Lender under this Agreement. Lender, within a reasonable time thereafter, shall advise Borrower of each such charge.

6.2    Collections; Modification of Terms.    Lender may, in its sole and absolute discretion and at any time, demand, sue for, collect or receive any money or property, at any time payable or receivable on account of or in exchange for, or make any compromises with respect to any Collateral it deems desirable including without limitation extending the time of payment, arranging for payment in installments, or otherwise modifying the terms with respect to payment or rights with respect to the Collateral, all of which may be effected without notice to or consent by Borrower and without otherwise discharging or affecting the Obligations, the Collateral or the security interests granted hereunder.

6.3    Notification of Account Debtors.    At any time, whether or not an Event of Default (as hereinafter defined) has occurred or is continuing, Lender, if it has not already done so, may notify the Account Debtors or obligors on any of the Collateral to make payment directly to Lender, and Lender may endorse all items of payment received by it which are payable to Borrower.  Borrower, at the request of Lender, shall notify the Account Debtors or other obligors of Lender's security interest in  the Collateral.

6.4    Uniform Commercial Code.    At all times during the term of this Agreement or until all sums due hereunder have been paid, and whether or not an Event of Default has occurred or is continuing, Lender shall be entitled to all the rights and remedies of a secured party under the Uniform Commercial Code as enacted in New York, as the same may be amended from time to time.

6.5    Preservation of Collateral.    At all times during the term of this Agreement or until all sums due hereunder have been paid, and whether or not an Event of Default has occurred or is continuing, Lender may take any and all action which in its sole and absolute discretion is necessary or proper to preserve its interest in the Collateral, including without limitation the payment of debts of Borrower which might, in Lender's sole and absolute discretion, impair the Collateral or Lender's security interest therein, purchase insurance on the Collateral, repair the Collateral, or pay taxes or assessments thereon, and the sums so expended by Lender shall be secured by the Collateral, shall constitute a portion of the Obligations and shall be

payable on demand with interest at the rate set forth in Section 1.2 hereof from the date expended by Lender until repaid by Borrower.

6.6    Mails.  Lender is authorized to (and Borrower shall, upon request of Lender) notify the postal authorities to deliver all mail, correspondence or parcels addressed to Borrower to Lender at such address as Lender may direct.  Lender will return to Borrower mail received by it that does not represent collections of Receivables or matters relating to Collateral after the Lender has examined same.

6.7    Lender's Right to Cure.  In the event Borrower shall fail to perform any of its obligations hereunder or under any of the Relevant Documents, then Lender, in addition to all of its rights and remedies hereunder, may perform the same at the cost and expense, or for the account, of Borrower, but shall not be obligated to do so. In any such event, Borrower shall promptly reimburse Lender together with interest at the rate set forth in Section 1.2 hereof from the date such sums are expended until repaid by Borrower.

6.8    Test Verifications.  Lender shall have the right to make test verifications of any and all Collateral in any manner and through any medium Lender considers advisable, and Borrower shall render any necessary assistance to Lender in such regard.

6.9    Power of Attorney.  Borrower hereby irrevocably appoints Lender as its lawful attorney and agent in fact to execute financing statements and other documents and agreements as Lender may deem necessary for the purpose of perfecting any security interests, mortgages or liens under any applicable law. Further, Lender is hereby authorized to file on behalf of Borrower, in its name, and at its expense, such financing statements, documents or agreements in any appropriate governmental office. Lender shall give Borrower notice of any filing made hereunder. Borrower hereby grants a power of attorney to Lender to endorse Borrower's name on checks, notes, acceptances, drafts and any other instruments requiring Borrower's endorsement, to change the address where Borrower's mail pertaining to the collection and administration of Collateral should be sent and to open all such mail and to do such other acts and things necessary to effectuate the purposes of this Agreement. All acts by Lender, its agents, employees, and attorneys are hereby ratified and approved, and neither the Lender, nor its agents, employees, and attorneys, shall be liable for any acts of omission or commission, or for any error of judgment or mistake. Borrower hereby grants a power of attorney to Lender to file proofs of loss respecting the Collateral with the appropriate insurers and to endorse any checks or drafts constituting insurance proceeds.  The powers of attorney granted to Lender in this Agreement are coupled with an interest and are irrevocable so long as this Agreement is in force. Lender will provide Borrower with copies of any documentation which the Lender creates or files hereunder.

21

6.10  Lender's Agent.  Lender hereby designates Sterling Financial Services Company ("SFS") as its agent for the purpose of exercising Lender's rights and carrying out Lender's duties under this Agreement, the Relevant Documents, or otherwise arising. Borrower hereby recognizes SFS as Lender's agent, agrees that SFS may give any notice, make any demand or do any act required or permitted to be given, made, or done hereunder with the same effect as if given, made or done by Lender, and agrees to discharge all of its duties hereunder, including the payment of Obligations, as directed by SFS.

7.    DEFAULT.

The occurrence of any of the following shall constitute an event of default ("Event of Default"):

7.1    Failure to Pay.  Failure to pay any Obligation or part thereof, including any installment of principal or interest or other charges due and owing to Lender or any of its Affiliates when due;

7.2    Failure to Perform.  Failure to perform or abide by any covenant contained in this Agreement or the Relevant Documents;

7.3    Cross Default; Default on Other Debt.  The occurrence of any default on any other obligation or indebtedness of Borrower or any guarantor of Borrower to any third parties so that the holder of such obligation or indebtedness declares such obligation or indebtedness due prior to its date of maturity;

7.4    False Representation or Warranty.  Borrower shall have made any representation or warranty in this Agreement, the Relevant Documents, or in any document or certificate executed by Borrower incident to this Agreement, which is at any time found to have been false in any material respect at the time such representation or warranty was made or thereafter;

7.5    Petition By or Against Borrower.  Borrower ceases to do business as a going concern or makes an assignment for the benefit of creditors, or any proceeding shall have been commenced by or against Borrower under any bankruptcy law or any amendment thereto (including without limitation a petition for reorganization, arrangement or extension) or under any other insolvency laws providing for the relief of debtors, or Borrower shall be adjudicated bankrupt, insolvent or in need of any relief provided to debtors by any court, or if a meeting of Borrower's creditors shall have been called;

22

7.6    <u>Appointment of Receiver.</u>    A receiver, custodian, trustee, conservator or liquidator is appointed for Borrower, or all or a substantial part of its assets;

7.7    <u>Judgments; Levies.</u>  If any final judgment or judgments (except those covered by insurance), or any levy, sequestration, or attachment, which in the aggregate exceed $5,000.00, against Borrower or its property, remains unpaid, undischarged, unsatisfied, unbonded or undismissed;

7.8    <u>Change in Condition.</u>  There occurs any change in the condition or affairs, financial or otherwise, of Borrower or of any endorser, guarantor of Borrower or surety for the liability of Borrower to Lender which in the opinion of Lender impairs Lender's security or increases its risk;

7.9    <u>Change in Ownership.</u>  At any time fifty-one percent (51%) or more of the beneficial ownership of the Borrower shall not be owned by Terri G. Noel and/or Thomas W. Jones;

7.10    <u>Insecurity.</u>  At any time the Lender deems itself insecure;

7.11    <u>Liquidation or Dissolution.</u>  The liquidation and/or dissolution of Borrower.

8.    <u>REMEDIES.</u>

8.1    <u>Acceleration; Right To Proceed Against Collateral.</u>

(a)    Upon notice by Lender of the occurrence of an Event of Default, the total amount (the "Default Amount") of (i) the aggregate amount of the unpaid balance of principal and interest of the Revolving Loan and all other sums which are then due and unpaid; and (ii) any other amount of principal and interest remaining to be repaid on all Obligations together with interest on the Default Amount at the rate provided for in Subsection 1.2 hereof, from said occurrence until paid in full shall, at the option of Lender, become immediately due and payable without further notice or demand; and

(b)    Borrower shall, at its expense, promptly deliver any or all Collateral not otherwise in the possession or control of Lender to such place as Lender may designate.  In addition, and not as an alternative to the preceding sentence, Lender shall have the right to enter upon the premises where the Collateral is located and (a) utilize any premises owned or leased by Borrower for the purpose of selling the Collateral, or (b) take immediate possession of and remove the Collateral, all without

23

liability to Borrower except such as is occasioned by the gross negligence of Lender, its employees or agents. Lender may sell, or cause to be sold, on Borrower's premises or elsewhere, any or all of the Collateral in one or more public or private sales or other dispositions, on such terms and at such price as Lender may deem advisable, for cash or on credit, for immediate or future delivery, in bulk or in parcels, without assumption of any credit risk, without demand of performance (which demand is hereby expressly waived), all on three (3) days notice to Borrower (if any notice is required by law) of any public sale or the time after which a private sale or other disposition may be made, which Borrower hereby agrees shall be reasonable notice of such sale or other disposition, and in connection therewith Lender may grant options and may impose reasonable conditions thereon, and the purchasers of any Collateral so sold shall thereafter hold the same absolutely, free from any claim or right of any kind, including any equity of redemption of Borrower (any such equity being hereby expressly waived and released), and Lender or any of its nominees or agents may buy the Collateral at any public sale. Lender may also elect to retain the Collateral or any part thereof and may apply the proceeds from the liquidation of the Collateral to Borrower's Obligations. The proceeds, if any, of any such sale or liquidation by Lender shall be applied: First, to the payment of all fees and expenses incurred by Lender as a result of such Event of Default, including without limitation any legal fees and expenses incurred in obtaining possession of the Collateral, preparing the Collateral for sale or lease, and selling and/or liquidating it; Second, to pay the Default Amount to the extent not previously paid by Borrower; and Third, to pay any excess remaining thereafter to Borrower. Borrower agrees that any action taken by Lender in accordance with this section 8.1(b) shall be deemed to be commercially reasonable.

(c)     In addition to and notwithstanding any other rights granted by law or this Agreement (or any limitations contained in this Agreement on any such rights), Lender shall have the rights and remedies with respect to the Collateral of a secured party under the Uniform Commercial Code of the State of New York.

8.2    Set-Offs.

(a)     Upon the occurrence of an Event of Default, Lender shall have the right, immediately and without notice or other action to set-off against any Obligations any money owed by Lender (or any affiliate of Lender) in any capacity to Borrower, including, without limitation money in any credit or deposit account, whether or not then due, and Lender shall deemed to have exercised such right of set off and to have made a charge against any such money immediately upon the occurrence of such Event of Default even though the actual book entries may be made at a time subsequent thereto.

(b)     If other lenders, including without limitation, affiliates of Lender, have participated with Lender with respect to loans to Borrower pursuant to

24

the terms hereof, then, Borrower hereby authorizes such other participating lenders, upon the occurrence of an Event of Default, immediately and without notice or other action, at the request of Lender, to set off against any of Borrower's liabilities to Lender any money owed by such participating lenders in any capacity to Borrower, whether or not due, and to remit the monies set-off to Lender.

8.3    Cumulative Remedies; Waivers.    No remedy referred to herein is intended to be exclusive, but each shall be cumulative and in addition to any other remedy referred to above or otherwise available to Lender at law or in equity.    No express or implied waiver by Lender of any default or Event of Default hereunder shall in any way be, or be construed to be, a waiver of any future or subsequent default or Event of Default.    The failure or delay of Lender in exercising any rights granted it hereunder upon any occurrence of any of the contingencies set forth herein shall not constitute a waiver of any such right upon the continuation or recurrence of any such contingencies or similar contingencies and any single or partial exercise of any particular right by Lender shall not exhaust the same or constitute a waiver of any other right provided herein.    The Events of Default and remedies provided herein are in addition to and are not restrictive of and shall be in addition to any and all other rights and remedies of Lender provided under the Uniform Commercial Code or other applicable law.

8.4    Waive Jury Trial    Lender and Borrower hereby waive all right to a trial by jury in any litigation relating to this Agreement, the Relevant Documents or other agreements or instruments between them.

8.5    Costs and Expenses.    Borrower shall be liable for all costs, charges and expenses, including in-house and outside attorneys' fees equal to 15 percent of the Obligations plus disbursements, incurred by Lender by reason of the occurrence of any Event of Default or the exercise of the Lender's remedies with respect thereto.

8.6    No Marshaling.    Lender shall be under no obligation whatsoever to proceed first against any of the Collateral before proceeding against any other of the Collateral.    It is expressly understood and agreed that all of the Collateral stands as equal security for all Obligations, and that Lender shall have the right to proceed against any or all of the Collateral in any order, or simultaneously, as in its sole and absolute discretion it shall determine.    It is further understood and agreed that Lender shall have the right, as it in its sole and absolute discretion shall determine to sell any or all of the Collateral in any order or simultaneously.